**No. 25-10356**

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

CHARLES FAULK,

Plaintiff–Appellant,

v.

OWENS CORNING ROOFING AND ASPHALT, LLC,

Defendant–Appellee.

On Appeal from the United States District Court

For the Northern District of Texas

**BRIEF OF APPELLANT**

Dated: May 27, 2025

CARLA D. AIKENS, P.L.C.

/s/ Carla D. Aikens
Carla D. Aikens
615 Griswold St., Ste. 709
Detroit, MI 48226
Tel:    (844) 835-2993
Fax:    (877) 454-1680
*Counsel for Plaintiff-Appellant Faulk*

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

Appellant certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluatepossible disqualification or recusal:

**1) Plaintiff-Appellant:**

Charles Faulk

**2) Defendants-Appellants:**

Owens Corning, LLC

**3) Counsel for Plaintiff-Appellant**

Carla D. Aikens, Dimitri Dube

**4) Counsel for Defendant-Appellee**

Andrew Turner, Jo Beth Drake, Gavin Martinson

<u>/s/ Carla D. Aikens</u>

Counsel for Plaintiff-Appellant Faulk

## **STATEMENT REGARDING ORAL ARGUMENT**

Plaintiff requests oral argument as he believes that this case raises significant issues related to the appropriate use of Rule 56 to dispose of cases where there are factual disputes.

This case exemplifies the constitutional and doctrinal erosion of summary judgment practice in civil rights litigation. As Justice Thomas warned in *Hittle v. City of Stockton*, 76 F.4th 877, 899–900 (9th Cir. 2023) (Thomas, J., dissenting), Rule 56 is increasingly being misapplied by lower courts as a fact-finding device that usurps the jury's core role. That is what occurred here.

Despite ample testimonial and documentary evidence supporting Plaintiff Charles Faulk's claims of race discrimination and retaliation, the district court dismissed his entire case on summary judgment. It did so after ordering Plaintiff to conduct additional discovery— including depositions of corroborating witnesses—only to later disregard that very testimony. It faulted Plaintiff for not identifying a comparator, even though comparator evidence is not required under *McDonnell Douglas* or Fifth Circuit precedent. Most egregiously, it credited the employer's self-serving "disavowal of racism" as if it were dispositive.

Summary judgment is not a mechanism for trial by affidavit or judicial disbelief. Rule 56, properly applied, permits dismissal only when no reasonable jury could find for the nonmovant. That standard was not met here.

## **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS ............................................................. 2

STATEMENT REGARDING ORAL ARGUMENT .................................................... 3

TABLE OF CONTENTS.......................................................................................... 4

TABLE OF AUTHORITIES .................................................................................... 5

JURISDICTIONAL STATEMENT ......................................................................... 6

ISSUES PRESENTED............................................................................................. 7

SUMMARY OF ARGUMENT .............................................................................. 29

CONCLUSION...................................................................................................... 37

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................................. 31

*Burton v. Freescale Semiconductor, Inc.*, 798 F. 3d 222 (5th Cir. 2015)................................... 30

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)............................................................................. 31

*Heinsohn v. Carabin & Shaw, PC*, 832 F. 3d 224 (5th Cir. 2016)............................................... 30

*Laxton v. Gap Inc.*, 333 F.3d 572 (5th Cir. 2003)......................................................................... 35

*Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133 (2000) ...................................................... 35

*Tolan v. Cotton*, 572 U.S. 650, 657 (2014) .................................................................................. 31

**Rules**

Fed. R. Civ. P. 56(a) ..................................................................................................................... 31

## **JURISDICTIONAL STATEMENT**

Jurisdiction lies under 28 U.S.C. §1291. Final judgment was entered on March 1, 2025.

Plaintiff timely filed a notice of appeal on March 28, 2025.

## ISSUES PRESENTED

1. Whether the district court erred in disregarding sworn declarations and deposition testimony submitted to oppose summary judgment.

2. Whether the district court improperly imposed a comparator requirement on Plaintiff's race discrimination and retaliation claims.

3. Whether a defendant's "disavowal of racism," among other purported defenses, can foreclose a finding of discriminatory motive on summary judgment.

## **STATEMENT OF THE CASE**

### **A.  Plaintiff Was A Good and Valuable Employee.**

Defendant ("Owens Corning") hired Charles Faulk on or about June 21, 2016 as a Utility Operator. During the course of his employment, Plaintiff acquired additional roles including forklift driver, end of the line driver, and Raw Material Coordinator, which were promotions.[1] Plaintiff was generally well-liked and had a good, cooperative attitude, training and helping others and filling in where needed, as verified by multiple witnesses.[2] Even Mike Brown admitted that Plaintiff was good at his job, claimed that he and Faulk had been on good standing with one another and that they had never had any arguments or disagreements until the conversation they had about people being treated equally regarding breaks, and that he did not yell and scream.[3] Despite Defendant's attempts to smear him and make him seem like he had a series of problems over the course of his career, in its statement of facts, Defendant admitted that the basis for his termination were the events that took place in 2022[4], all of which occurred after he complained to HR about Mike Brown deactivating his overtime.

Defendant even entrusted Plaintiff to train new hires on how to drive a forklift, as well as to be the forklift instructor in the building, and only did not complete the instructor training course because Mike Brown had an issue with him leaving his shift early to get rest.[5] Steven Brunt, Plaintiff's supervisor on another shift, stated that he wished "20x" that he had Plaintiff available as a forklift driver for an issue he was having scheduling shifts, even between Jaqualyn Brown, whom Mike Brown solicited to go to HR on Plaintiff, and Kamron Robbins-Lopez,

---

[1] ROA.1306-1307.
[2] *E.g.*, ROA.1558; ROA.1562.
[3] ROA.1659; ROA.1606-1607.
[4] ROA.1252.
[5] ROA.2189; ROA.1926.

whom Defendant claims it replaced with Plaintiff even though he was already working there in the same role[6]:



Unfortunately, per the message, Mike Brown had already had him suspended.

### B.  Mike Brown's History of Questionable Behavior, Discrimination and Retaliation.

Many times in the lower court, Defendant stated without evidence that Mike Brown was not involved, but it has provided no proof of the same other than unsupported statements in its brief. Defendant cannot make true something that is clearly not, as what happened to Plaintiff is exactly what happened to other Black employees who worked under Mike Brown.

As a primary matter, Mike Brown had obtained protected status at the Irving plant by virtue of his wife's father, John Gauna, who was the shipping supervisor of one of the three main divisions (Trumbull) of the company, and who was also best friends with the chairman of the

---

[6] ROA.1911.

company.[7] He was unsurprisingly promoted within nine months of being hired, promoted again within another two to three years, and was even getting ready to be promoted yet again at the time of his continued deposition in June of 2024.[8]

As Plaintiff has attested, it was well known in Irving that Mike Brown had a problem Black people and that he had a history of writing them up disproportionately.[9] One of the first instances Plaintiff observed was when Brown "laid in wait" in the break room – an area for his subordinates that he never visited – just so he could write up a Black employee named Cornell Rivers.[10] When Faulk said in the locker room that Mike Brown would not have done this to a white employee, Zach Probst, Brown actually confronted him about his comments and Faulk repeated that he would not have done what that to Probst.[11] Plaintiff discussed with Mr. Rivers that Brown was racist, and Rivers is also the one who alerted Plaintiff to Brown's Facebook page with the Confederate flag.[12] The screenshot which Defendant provided was as follows[13]:



---

[7] ROA.1580-1581; ROA.1920.
[8] ROA.1582-83, ROA.1585-86; ROA.1791-1792.
[9] ROA.1920.
[10] *Id.*; ROA (sealed) at ECF No. 74-1 (Plaintiff's Transcript at 160:12-161:20; 162:8-163:7).
[11] ROA.1922; ROA (sealed) at ECF No. 74-1 (Plaintiff's Transcript at 162:25-163:7).
[12] ROA (sealed) at ECF No. 74-1 (Plaintiff's Transcript at 165:7-21).
[13] ROA.2226-2227.

Though Defendant went to great lengths to claim that this post was not Mike Brown's own post and that the garage was not his, this is quite clearly not a repost, and nothing in the post indicates that it is not his garage.

Another situation involving Probst is what caused Brown to start to harass and single out Plaintiff. As stated in his declaration, Probst tried to jokingly jump in front of Plaintiff's forklift while Faulk was driving it, and Faulk reported it because Probst could have been seriously hurt.[14] Probst also did not get in trouble for his many offenses that he committed, including on the forklift, as he was a good friend of Mike Brown.[15]

In addition, Defendant's former employees made clear that Brown's disdain for Black employees on his shift was not imagined, it was real, and it had real consequences for them and several others.

### 1. Timothy Holden's Declaration

Timothy Holden is a Black man who worked for Owens Corning in the Irving location from approximately January or February of 2022 until he was fired a few months later in April of 2022.[16] Holden got into the job because of Jaqualyn "Jay" Allen, whom he had known since middle school.[17] He was hired through Aerotek, a temp company, who told him that Owens Corning did not drug test for marijuana, and he know Owens Corning hired people who smoked marijuana and that people who worked there smoked all the time.[18]

---

[14] ROA.1922.
[15] *Id.*
[16] ROA.1556.
[17] *Id.*
[18] *Id.*

Holden observed that Faulk got the worst of the mistreatment that Black people at Owens Corning suffered.[19] He observed that Black people did not have a voice and stayed mostly quiet if they wanted to work there because there was high turnover and Black people did not last long.[20] He noted that he lasted a long time just being there a few months.[21] The only way Black workers could stay in Owens Corning was to not say anything and go along with what they said.[22] Holden watched Jay Allen and LeShan Brown get talked to terribly and they never said anything.[23]

Holden continued on by stating that Owens Corning was one of the worst jobs of his life, and that he only stayed there as long as he did because it paid well.[24] When Holden started, he could tell right away that there was a deep hate for Faulk, because they were talking about him when he was not even there.[25] Holden could not understand why because he met him after hearing about him, and he was nothing but nice and always happy, and he was the only one who actually showed him how to do his job.[26] Holden observed that he believed people at Owens Corning did not like Faulk because he would show Black people how to do their jobs when others would not help them.[27]

Holden talked to his childhood friend Jay Allen about it and he told him not to say anything.[28] He saw that LeShan Brown and Jay Allen were given benefits for turning on Faulk,

---

[19] *Id.*
[20] *Id.*
[21] *Id.*
[22] *Id.*
[23] *Id.*
[24] ROA.1557.
[25] *Id.*
[26] *Id.*
[27] *Id.*
[28] *Id.*

and he saw Allen get promoted at least twice in the short time he was there.[29] He observed a Hispanic man on the forklift drop pallets and keep on working, and nothing happened to him at all.[30] Plaintiff took a video of an example of pallets being dropped by someone else, that he was forced to clean up, but the person was not written up nor tested.[31] However, if a Black person messed up, they would get drug-tested or let go for minor reasons.[32] Owens Corning only caught people they wanted to catch and would write them up.[33] It was a very hostile environment, and Holden wanted to quit before they fired him because it was hard to work under those circumstances.[34] Holden observed that white people were allowed to get away with behavior that Black people could not do.[35]

Holden noted that Gil Norman was very aggressive and no one ever said anything to him, and that Zach Probst would talk about f***ing people in the a** and was always inappropriate, and he never got in trouble, either.[36] Holden stated that Probst would spit tobacco on the floor and Mike Brown would just laugh.[37]

Holden observed Gil Norman go into a rage on Faulk, and he could not believe how angry he was, but Faulk stayed calm. (***Id.*** at ¶19). Holden stated that if something happened

---

[29] *Id.*
[30] *Id.*
[31] Video Submitted to Lower Court at ECF No. 76 - **Ex. O, Video of Dropped Pallets**; ROA.1920).
[32] ROA.1557.
[33] *Id.*
[34] *Id.*
[35] ROA.1557-58.
[36] *Id.*
[37] *Id.*

between Faulk and anyone, including him, Mike Brown was telling everyone about it, and that the environment was "like a soap opera."[38]

Of note, Holden attested that Mike Brown came to him and asked him about Faulk asking him to go to breakfast, making it seem like it was a problem and trying to see if he was bothering me.[39] After that happened, there was a forklift position that was open. Plaintiff had applied to be a forklift driver when he started but he had to start as an auditor.[40]  But this time, Mike Brown asked him if he wanted to drive forklift, which he said yes, because it paid more money.[41] Then Mike Brown said Faulk was saying things about him and that he needed Holden to go and talk to HR about Faulk and tell them that Faulk was causing problems.[42] The next day, Holden went in to talk to Rebecca Pike and she told him that Mike Brown told her that Holden said to him that Faulk was bothering him.[43] Holden told her that he was not bothering him and that Faulk had just taught Holden how to drive the forklift the night before when no one else would show him.[44] Holden also told Pike that Mike Brown did not like Brown, that he thought it was because he had a problem with Black people and that it was retaliation, but she was defending Mike Brown and she acted like she did not want to hear it.[45] Holden could tell that they were trying to get rid of Faulk.[46]

---

[38] ROA 1558.
[39] *Id.*
[40] *Id.*
[41] *Id.*
[42] *Id.*
[43] *Id.*
[44] *Id.*
[45] *Id.*
[46] *Id.*

As soon as he had spoken to Pike and did not do what Brown wanted, Holden noted that everything changed and Mike Brown would not talk to him at all.[47] While working there, Holden heard people talking about Mike Brown's Facebook page that had a Confederate flag in his garage, so he went on there and saw it, and he decided he was not going to deal with him because he knew he was going to be treated like Faulk.[48]

Holden noted that not more than a few days later, he had almost gotten hit that day by a forklift driven by a Hispanic driver, and he had some words because he could have been seriously injured.[49] However, he was falsely accused of taking off his shirt to fight when leaving work, and had to have Jay Allen vouch for him.[50] He was warned that if he did anything else, he would be fired.[51]  Not long after this, Holden was fired the weekend of Easter, allegedly for being on his phone which rang while he was on the forklift, even though he had not even answered it before being written up by Brown.[52] When this happened, Mike Brown was smiling and being nice to him, even though he had stopped speaking to Holden, and he drove Holden to his car and told him he would be back in 3 days after a suspension, but the next day he was fired.[53]  Holden observed that every driver talked on their phone, and they were talking on their phone the same day that he got in trouble, including Joseph, the lead, and Victor, who ran the line, who are both Hispanic, Robbins-Lopez and LeShan Brown.[54] It was clear to Holden that he was fired because he would not go along with Mike Brown's plan to get rid of Faulk, but he was

---

[47] *Id.*
[48] *Id.*
[49] ROA.1559.
[50] *Id.*
[51] *Id.*
[52] *Id.*
[53] *Id.*
[54] *Id.*

not willing to lie to keep the job.[55] He and Jay Allen stopped speaking because of this situation, because Holden thought it was wrong for Allen to try to help Mike Brown get Faulk fired when he knew Faulk had not done anything wrong.[56]

### 2. Quinterious Williams' Declaration

First, Brown had an issue with Black employees besides Faulk. As stated by Quinterious Williams, a Black employee who worked for Defendant for nearly eight years, he had no problems at Owens Corning until the last 6 to 8 months of his time there – from the middle of 2022 to January of 2023 – when he moved to night shift to work under Brown, because it paid more, and he also worked with Faulk.[57] Williams stated that Faulk was a "good and honest guy and a good worker."[58] When he came to the night shift, Williams stated that it was clear to him that Mike Brown did not like Faulk, and noted that Faulk was about equality and people being treated fairly.[59] When Williams was moving over to the night shift, a lot of people told him that Mike Brown would try to fire him.[60] He noted that Brown did not treat Black people the same way that he did others.[61] At the pre-shift meetings, on more than a few occasions, Brown would talk to them about the prior shift and what they needed to do, and then he would ask if anyone had anything else to discuss; any time Faulk tried to talk about being treated fairly, Brown would shut it down and tell everyone to go to work.[62] Further, Williams noted that there was a Black employee named Shaughnessy Sims who would get drug-tested every single time he would try to

---

[55] *Id.*
[56] ROA.1560.
[57] ROA.1562.
[58] *Id.*
[59] *Id.*
[60] *Id.*
[61] *Id.*
[62] *Id.*

sign up for a new job, to the point that it did not seem random.[63] Williams was not ever tested

when he was on the day shift. [64]While Defendant tried to drug-test Faulk for dropping pallets,

Williams noted that everyone who did Faulk's job dropped pallets all the time.[65] Williams stated

that he dropped pallets with materials on them multiple times when he worked the day shift, and

he was never written up nor drug-tested.[66] Williams said that he never saw anyone get written up

for dropping pallets besides Faulk, because it happened too much because of how steep the ramp

was.[67] Williams noted that Joseph Martinez, who was Hispanic, even hit his own car with a

forklift and he did not get drug-tested.[68] Faulk confirmed this at his deposition, and that Martinez

never told them he got tested which he would have mentioned, even though Defendant's counsel

claimed otherwise.[69]

Williams continued that Owens Corning employees would make up policies as they went

along and then only have it apply to some people and not others.[70] One example Williams gave

was that they said they were only supposed to take five pallets at a time when Faulk got in

trouble, but no one ever did that and they knew that no one did that.[71] Williams observed that

Defendant's employees would pull out the policy only when they wanted to justify punishing

someone they wanted to target.[72]

---

[63] ROA.1562-1563.
[64] *Id.*
[65] ROA.1563.
[66] *Id.*
[67] *Id.*
[68] *Id.*
[69] ROA (sealed) at ECF No. 74-1 (Plaintiff's Transcript at 181:9-183:24).
[70] ROA.1563.
[71] *Id.*
[72] *Id.*

Williams further indicated that when he moved to nights, after not being written for almost 7 and a half years except for once or twice that he could recall, he was written up by Mike Brown **six times** in the 6 to 8 months that he was on the night shift.[73] Mr. Williams was the employee who was written up which caused Gil Norman to yell at Faulk and call him a "snitch" for talking to Mike Brown about treating employees fairly.[74] Williams recalled that Norman "went off" on Faulk while Faulk stayed calm, and that Norman said "this mother****** is snitching."[75] This conversation was recorded by Mike Brown and produced to Plaintiff belatedly in discovery.[76] Mr. Williams was written up by Brown for taking a long break while people like Norman, whom Williams characterized as not speaking up for anything and "kissing up" to Brown, did not get in trouble and was allowed to take a longer break of an hour while he only was permitted to take a half hour break, which he found unfair.[77] Williams observed that Faulk was trying to stand up and make sure the Black employees were treated fairly, when the reality was they were not being treated fairly at all.[78]

Mr. Williams was also written up by Mike Brown for having on headphones and being on his phone, but Williams stated that everyone in there was on their phone.[79] Williams stated that Brown would sometimes call non-Black employees on their phones – especially the coordinator – while they were working, and most of them also had on headphones and they never got in trouble or written up. [80]In contrast, Williams noted that Zach Probst, who was white, always had

---

[73] *Id.*
[74] ROA (sealed) at ECF No. 74-1 (Plaintiff's Transcript at 118:1-9).
[75] ROA.1563-1564.
[76] Audio Submitted to District Court at ECF Nos. 74, 76 - **Ex. N, Brown Recording of Conversation with Faulk**.
[77] ROA 1563.
[78] ROA 1564-1564.
[79] ROA 1564.
[80] *Id.*

on his Airpods when he went in to talk to Mike Brown and he never got in trouble, and that Probst still worked there until being let go recently.[81]

As to overtime, Williams observed that Brown would give out callbacks for overtime by talking to people personally so he would pick and choose who received it, and he confirmed that Brown took Faulk and fellow Black employee Shaughnessy Sims out of the overtime system completely.[82] Sims was only receiving callbacks for dayshifts, and Mike Brown took him off of the night shift.[83] Sims and Fearce, both Black, were terminated by Brown for substance abuse violations – the only such terminations for such a violation.[84] Faulk confirmed that Sims' overtime was removed around the same time that his was[85], even though Defendant claimed this had never happened to anyone but Faulk.[86] Williams confirmed that Faulk knew a lot of the jobs there so he was always able to do a lot of the overtime jobs.[87]

As to the behavior of other employees that Owens Corning permitted, Williams observed that, Ivan Villegas, a Hispanic coordinator whose father was his boss, would often wear Airpods and prop up his phone and watch movies for hours at a time and no one said anything to him[88]. Williams observed that Villegas did whatever he wanted, and that he would often admit to him that he was high on cocaine at work, and was never drug-tested.[89] Villegas was also allowed to take breaks for two to three hours at a time.[90]

---

[81] *Id.*
[82] ROA.1565-1566.
[83] ROA.1566.
[84] ROA.1287-1289.
[85] ROA.1923.
[86] ROA.2084.
[87] ROA.1565.
[88] *Id.*
[89] *Id.*
[90] *Id.*

As to what he observed of Brown's personality, Williams stated that some days Mike Brown would speak to him and other days he would just look at him and say nothing.[91] Williams stated that Brown spoke negatively about Faulk and told him to stay away from Faulk, claiming that Faulk was "all about drama and starting things," but he would just brush him off because Faulk was not like that.[92] When Williams moved over to the night shift, Brown would tell people in Williams' presence that "Q is Charles' buddy," and that they should watch what they say around him.[93] But Williams did not understand Brown's comments because he had not known Faulk for long since he was new to the night shift.[94] Once Brown found out from someone that Williams had socialized with Faulk outside of work one time, and he stopped speaking to me altogether.[95]

Regarding marijuana testing, when Williams started, he said Owens Corning had problems hiring people because they failed marijuana tests, and that they only cared about marijuana if someone was "high" and they were suspicious that the person was high at work.[96] Williams noted that Owens Corning stopped random tests for marijuana, but if someone had already failed a drug test under the prior policy, they would be tested for it and could get fired for it.[97]

Williams stated that it was clear that Faulk had been railroaded by the company because he was trying to make everything equal.[98] Williams himself grew tired of working for Owens

---

[91] *Id.*
[92] *Id.*
[93] *Id.*
[94] *Id.*
[95] ROA.1565-1566.
[96] ROA.1566.
[97] *Id.*
[98] *Id.*

Corning and wanted to quit because he could not tolerate being harassed by Mike Brown.[99] In addition to Faulk, Shaughnessy Sims told Williams that he, too, felt like he had been railroaded by Mike Brown, which is also what Williams believed. Sims was fired following a drug test for marijuana, even though Owens Corning had said they were not testing for it.[100] Whenever Sims signed up for a job, he was "randomly" tested again and got fired.[101]

Williams noted that other Black people quit because they did not want to deal with Mike Brown.[102] Not long after Faulk was terminated, Kamron Robbins-Lopez, who is Black, was on the forklift, and Williams observed that Mike Brown messed with him, too.[103] He confirmed that Brown suspended Robbins-Lopez for three days for sitting on his forklift even though he had done everything he had been asked to do after making his usual rounds.[104]

Despite nearly eight years of service, Brown fired, Williams, in about January of 2023, after he had fallen asleep during a night shift, and Mike Brown came and wrote him up.[105] Other people fell asleep, and did not get written up for it.[106] After his sixth write-up, Williams went to HR the next day and told them that he could not take working with Mike Brown anymore and that he wanted to quit.[107] HR told him that he could quit or they could fire him so that he could

---

[99] *Id.*
[100] *Id.*
[101] *Id.*
[102] *Id.*
[103] ROA.1566-1567.
[104] ROA.1567.
[105] *Id.*
[106] *Id.*
[107] *Id.*

collect unemployment.[108] Owens Corning told the unemployment office that Williams was let go for lack of performance.[109]

Williams finally observed that Owens Corning let Mike Brown harass and terminate Black people at a high rate on the night shift.[110] He noted that anyone observing Mike Brown's track record, would see that he fired a lot of Black people on his shift, as opposed to what happened on other shift, and that Black people did not get treated the same way on day shift like they did on night shift with Mike Brown.[111]

### C.  "Sean's" Text to Plaintiff

Plaintiff supplied the text message from Sean, a white employee who was fired in April 2022 and set up by Defendant, not long after he told people at work that Brown was smoking marijuana when he drove him home.[112] Sean warned Plaintiff that he would suffer the same fate and referred to Defendant as slaveowners.[113]

Plaintiff even told the drug counselor what was happening to him, before he was fired.[114]

### D.  Other Conflicts of Interest

Faulk noted the conflicts of interest at play, in particular with Hana Lane and Mike Brown, who were engaged in a sexual relationship, which Faulk believed caused her to never go against Brown.[115] He further noted that Tiffany Buffin, Defendant's HR employee, was in a

---

[108] *Id.*
[109] *Id.*
[110] *Id.*
[111] *Id.*
[112] ROA.1925.
[113] ROA.2232.
[114] ROA.2234.
[115] ROA.1920.

relationship with Rene Perez[116], the same gentleman who sent an extremely racially offensive text to Mike Brown about Faulk's termination, and who still works at Owens Corning[117]:





Buffin further never helped Holden when he complained about unfair treatment.[118] This text was not produced until a day prior to Brown's second deposition.[119]

### E.  Plaintiff's Overtime

---

[116] ROA.1925-1926.
[117] ROA.1856-1858.
[118] ROA.1558.
[119] ROA.1843.

In Plaintiff's many roles with Defendant, he was allowed to collect overtime, which could be viewed via a company portal called Crewsense. In or around February 2022, Defendant admits that Plaintiff's ability to collect overtime was cut off by Mike Brown, Plaintiff's supervisor. Defendant further admitted that the time the overtime was cut off was February of 2022.[120] Rebecca Pike had a very difficult time in her fact deposition admitting that Brown had intentionally deactivated Plaintiff's overtime, despite admitting to the same in her corporate representative deposition.[121] Mysteriously, there is nothing on the log Defendant produced that reflects that Faulk's overtime access was deactivated or that it was eventually reactivated, as admitted to by Defendant, on February 13, 2022.[122] Rebecca Pike, head of HR for Defendant, admitted that Plaintiff came to her about his concern that Mike Brown turned off his overtime.[123] While the representative, Rebecca Pike, stated that he still had access to some jobs, it is clear from Faulk's CrewSense log that depriving him of overtime on utility work cost him money, since he was qualified for utility overtime work, per his profile and the fact that he had done utility overtime a few days prior, and then suddenly was not, all in the same day.[124] He was not given this money back.[125] Plaintiff had just texted Brunt about working overtime in the utility role – which Brunt gave him – just a few days prior to it being shut off by Brown.[126] Defendant, however, never investigated this concern, even though Defendant also admitted that Faulk believed Brown was singling him out.[127] Though Defendant claimed this discussion happened in

---

[120] ROA.1515-1516.
[121] ROA.1939-1943.
[122] ROA.1914; ROA.1310-1311, ROA.1343.
[123] ROA.1309, ROA.1343-1343.
[124] ROA.1916, ROA 1895.
[125] ROA.1924-25.
[126] ROA.1893, ROA.1914.
[127] ROA.1345-1347.

March of 2022[128] that was the date Plaintiff followed up with Rebecca Pike after hearing nothing when he reported the issue when it happened on February 13, 2022 – as evidenced by the date on the screenshots he later sent her in March when she asked for evidence[129], and the fact that Faulk logged in to Crewsense on that date[130], which is the only time he did that in all of the entries on the page. Further, Steven Brunt reactivated Plaintiff's overtime after he showed him the screenshot.[131]

Though Defendant had its witnesses fabricate an elaborate story about Faulk not being "recertified" on utility – the entry level position at the plant – there is simply no such thing as having to recertify for that role much less any other one in Irving.[132] Defendant does not even keep formal paperwork regarding the same, as evidenced by the fact that it has never produced any, the testimony of Faulk and Williams who worked there, and the fact that Defendant reactivated his utility role overtime without requiring any recertification.[133] Even the forklift drivers only had to take a single course.[134] Pike admitted at her fact deposition that Brown "should not have [turned off Plaintiff's utility overtime] that without getting the operations leader, Hana Lane's, approval."[135] Brown was not disciplined for this, only spoken to by Hana Lane.[136]

### F. Remaining Claims of Plaintiff's Misconduct

---

[128] ROA.1354.
[129] ROA.1918.
[130] ROA.1914.
[131] ROA.1923
[132] ROA (sealed) at ECF No. 74-1 (Plaintiff's Transcript at 51:16-52:4; ROA.1923; ROA.1565.
[133] ROA.1923; ROA.1565; ROA.1345.
[134] ROA.1565.
[135] ROA.1944.
[136] ROA.1945.

Plaintiff disputes that he ever left a forklift running or that any of the purported witnesses – who also had problems with Black employees – ever checked, as they never even asked him about the situation.[137] Instead, once word had gotten around that Plaintiff was going to the EEOC in late June – after he talked to Rhonda Hrabchak, head of safety, for an hour while she was on vacation about what he was experiencing[138], Defendant's agents – including Hrabchak – sent a concerning number of texts about Faulk, including with the person who was supposed to have ordered the drug test – Kennedy Reister – not even knowing what to do.[139]

As to the hopper situation, the hopper should not have been put on the floor, and others had been using it that way on prior shifts.[140]

Defendant further has provided no written policy regarding the hopper needing to be inspected by a forklift driver, being drug tested after a pallet drop, even if it had one and only applied it unevenly, as stated above. Defendant provided an incident report, but has no proof of him ever being written up for the pallets dropping. Moreover, the pallet drop was caused by Plaintiff having to stop suddenly for a reversing Jay Allen on a forklift.[141] While this incident would have no doubt been recorded, there was no investigation into Allen's actions.[142] Hrabchak confirmed to Plaintiff in the phone call they had that he should not have been drug tested.[143]

---

[137] ROA.1927-1928.
[138] ROA.1928.
[139] ROA (sealed) at ECF No. 74-2 (**Ex. P, Defendant's Texts About Plaintiff**).
[140] ROA.1947.
[141] *Id.*
[142] *Id.*
[143] *Id.*

Further, Plaintiff went to the EEOC at the end of June, and had contacted the EEOC by the time he returned from his suspension in July.[144]



Finally, Plaintiff told Rebecca Pike that Brown was treating him unfairly on the basis of race[145], told Pike about the Confederate flag post while he was employed – despite her claim he did not – and Defendant did nothing but fire him.

---

[144] ROA.1927, ROA.1928.
[145] ROA.1924-1925

### G. Holden and Williams Depositions

Mr. Williams' testimony was clear and unequivocal: he believed there to be racial discrimination against Black people by Mike Brown, who stated that the majority of the Black people fired were on Brown's shift.[146] Further, while Defendant claims Williams did commit an infraction regarding headphones, Mr. Williams clearly did not agree with the write-up and thought it was discriminatory.[147] Defendant misstates Mr. Williams' testimony to the extent that it is arguing that the totality of his testimony supported its position.

As to Defendant's argument that Mr. Holden failed to identify a comparator, this is false. Defendant would, of course, identify every other incident involving another person as "stitched together speculation," but at the summary judgment stage, the facts must be taken in a light most favorable to Plaintiff. Defendant's version of Mr. Holden's testimony is inaccurate, at best. Mr. Holden spoke extensively of the hostile work environment on the basis of race.[148] He also stated that Mike Brown was involved in all aspects of things that happened there at the plant and that HR blew off his complaints about the hostile work environment.[149] Mr. Holden further stated that Mike Brown did not like Faulk but that Faulk did not bother him.[150] He stated that he did not understand why Mr. Faulk was not liked by others and this fact is why he went to HR and told the truth about Mike Brown asking him to say something untrue about Mr. Faulk.[151] He also stated that Mr. Faulk was not liked because he would show Black employees how to do their jobs.[152] The same people whom Defendant cites as Black people who received preferential treatment, Mr. Holden described

---

[146] ROA.2680-2681.

[147] ROA.2681.

[148] ROA.2681.

[149] *Id.*

[150] *Id.*

[151] *Id.*

[152] *Id.*

as receiving those benefits because they turned on Mr. Faulk.[153] Mr. Holden stated that one of these same employees, Jay Allen, told Mr. Holden that Mike Brown said he wanted Mr. Faulk fired.[154]

Even the citations provided by Defendant make clear that Mr. Holden understood he was being given the forklift position because Mike Brown was trying to entice him to go to HR to lie about Mr. Faulk.[155]

## SUMMARY OF ARGUMENT

1. The district court violated Rule 56 by disregarding Plaintiff's supporting evidence, including declarations and deposition testimony.

2. The court erroneously imposed a comparator requirement not found in Title VII or §1981 jurisprudence.

3. The court accepted Owens Corning's denial of racism as dispositive, contrary to binding Supreme Court and Fifth Circuit precedent.

4. The evidence as a whole permits a reasonable jury to infer racial animus and retaliation.

## ARGUMENT

### I.    THE DISTRICT COURT MISAPPLIED THE SUMMARY JUDGMENT STANDARD AND DISREGARDED EVIDENCE

The trial court's ruling improperly excluded competent summary judgment material and engaged in factual determinations inappropriate at this stage.

To begin, the court erred in discounting the sworn deposition testimony of Timothy Holden and Quinterious Williams. Plaintiff originally submitted their declarations, to which the district court responded by taking the unusual step of having them sit for depositions after

---

[153]ROA.2682.
[154]*Id.*
[155] *Id.*

summary judgment briefing had been completed. At the Court's direction, Defendant questioned

both men at length in depositions, challenging their declarations line-by-line, yet failed to

produce counter-evidence—opting instead to discredit these witnesses without basis. The district

court adopted this tactic by treating their observations as speculative or not based on personal

knowledge.

This is not the law. "Personal knowledge" does not require that the witness have

personally observe every detail firsthand. Testimony based on what they saw, heard, and

experienced—including their understanding of worksite culture and conversations with

supervisors—is admissible under Fed. R. Civ. P. 56(c). As this court has held:

> When, as here, a motion for summary judgment is premised almost
> entirely on the basis of depositions, declarations, and affidavits, a
> court must resist the urge to resolve the dispute — especially when,
> as here, it does not even have the complete depositions.

*Heinsohn v. Carabin & Shaw, PC*, 832 F. 3d 224, 245 (5th Cir. 2016). Further, the trial court is

not permitted to decide which evidence to credit on a motion for summary judgment:

> This approach is inconsistent with fundamental rules governing
> summary judgment. By choosing which testimony to credit and
> which to discard, "the court improperly `weigh[ed] the evidence'
> and resolved disputed issues in favor of the moving party." *Tolan v.
> Cotton*, ___ U.S. ___, 134 S.Ct. 1861, 1866, 188 L.Ed.2d 895 (2014)
> (per curiam) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,
> 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986)). While
> utilization of the *McDonnell Douglas* framework requires fact-
> intensive analysis, it does not alter basic summary judgment law,
> which must control and restrain the inquiry.

*Burton v. Freescale Semiconductor, Inc.*, 798 F. 3d 222, 236 (5th Cir. 2015).

Holden's testimony detailed how Brown manipulated plant dynamics to retaliate against

Faulk—including promoting individuals who "turned on Faulk," instructing others to lie to HR,

and rewarding loyalty with better job assignments. Williams corroborated racial bias in Brown's management, stating that most terminated Black employees were under Brown's supervision. The trial court's wholesale rejection of this testimony ignored both Rule 56 and controlling precedent. These credibility assessments are for a jury—not a judge—to make. *See Tolan v. Cotton*, 572 U.S. 650, 657 (2014).

## II.     THE DISTRICT COURT APPLIED THE WRONG LEGAL STANDARD AT SUMMARY JUDGMENT

Summary judgment is only appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Courts must view the facts in the light most favorable to the nonmovant and draw all justifiable inferences in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge..." *Id.*

The district court improperly resolved disputed facts and disregarded corroborated declarations. The Fifth Circuit has long held that a nonmovant's sworn testimony cannot be dismissed as "self-serving":

> [Plaintiff's] statements are no more and no less self-serving than those of the others. If we toss [plaintiff's] deposition, we must also toss the depositions, affidavits, and declarations of the others for the same reason. To hold otherwise would signal that an employee's account could never prevail over an employer's. This would render an employee's protections against discrimination meaningless.

*Heinsohn,* 832 F. 3d at 244. Moreover, all evidence can be considered "self-serving" – it is not for the trial court to assess the credibility of the same so long as the witness has personal knowledge:

> First, "self-serving" affidavits and depositions may create fact issues even if not supported by the rest of the record. Where self-interested affidavits are otherwise competent evidence, they may not be discounted just because they happen to be self-interested. Indeed, "[e]vidence proffered by one side to ... defeat a motion for summary judgment will inevitably appear `self-serving.'" Dall./Fort Worth Int'l Airport Bd. v. INet Airport Sys., Inc., 819 F.3d 245, 253 n.14 (5th Cir. 2016). But self-serving evidence may not be discounted on that basis alone. How much weight to credit self-interested evidence is a question of credibility, which judges may not evaluate at the summary judgment stage. E.g., Int'l Shortstop, Inc., 939 F.2d at 1263.

*Guzman v. Allstate Assur. Co.*, 18 F. 4th 157, 160-61(5th Cir. 2021). The court below violated these principles repeatedly.

Moreover, courts cannot discount declarations based on form or supposed admissibility concerns at summary judgment. Evidence "need not be in a form that would be admissible at trial." *Celotex*, 477 U.S. at 324. The credibility of testimony based on lived workplace experience is precisely the role of juries.

Plaintiff, Timothy Holden and Quinterious Williams gave detailed, firsthand accounts of the disparate treatment of Black employees by Mike Brown. Their testimony was corroborated by other documents, declarations, and contemporaneous texts and images. The district court failed to apply Rule 56 correctly by rejecting their testimony based on improper factual assessments.

### III.    PLAINTIFF ESTABLISHED A PRIMA FACIE CASE OF DISCRIMINATION

The district court made a rigid finding with respect to whether Plaintiff established a prima facie case of discrimination under Title VII of 42 U.S.C. §1981.

Comparator evidence is not the only way to meet the fourth prong. The U.S. Supreme Court has held repeatedly that the *McDonnell Douglas* framework is not rigid. *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978); *Teamsters v. United States*, 431 U.S. 324, 358 (1977). As noted by Justice Thomas in *Hittle v. City of Stockton*, *McDonnell-Douglas* was not meant to apply to all situations and was not intended to be used for summary judgment at all. The central question is whether the circumstances support an inference of unlawful discrimination. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 n.6 (1981) (noting that the *McDonnell Douglas* "standard is not inflexible, as '[t]he facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not necessarily applicable in every respect in differing factual situations.'") (quoting *McDonnell Douglas,* 411 U.S. at 802, n. 13).

Here, Faulk was qualified, had no major performance issues for years, and was abruptly terminated after he complained about Brown's conduct. However, he did provide comparators, which supported that the basis for his termination was pretextual. He presented evidence that others—especially white or Hispanic employees—violated the same policies without consequence. Probst, Villegas, and others wore AirPods, used phones on forklifts, dropped pallets, and even admitted to drug use without termination. In comparison, Black employees such as Faulk, Williams and Holden were held to a different standard. Brown selectively enforced rules and targeted Black employees for discipline and drug testing. Faulk has shown far more than required to create a jury question under the prima facie framework.

## IV.    PLAINTIFF ESTABLISHED A PRIMA FACIE CASE OF RETALIATION

To state a prima facie case of retaliation under Title VII, a plaintiff must show: (1) he engaged in protected activity, (2) his employer knew of the activity, (3) he suffered an adverse action, and (4) there was a causal link. *Shirley v. Chrysler First, Inc.*, 970 F.2d 39, 42 (5th Cir. 1992).

Faulk complained to HR about Brown deactivating his overtime, raising concerns about unequal treatment based on race. Within weeks, he was drug tested, written up, and terminated for wearing AirPods—a policy violation that had never been enforced against other employees. Brown had solicited Holden to lie about Faulk and tried to rally other Black employees to isolate him. Moreover, Plaintiff went to the EEOC just a week before he was fired. At this point, Defendant began scrambling to find ways to terminate Faulk once it was clear he was engaging in protected activity. Proximity in time alone can establish causation. *Fabela v. Socorro Indep. Sch. Dist.*, 329 F.3d 409, 416 (5th Cir. 2003). The fact that Defendant claims it did not know this is for a jury to determine whether it believes this. Based upon the circumstances presented, a reasonable jury could infer that his firing was retaliatory.

## V.    DEFENDANT'S PROFFERED REASONS ARE PRETEXTUAL

Owens Corning claims Faulk was fired for violating a safety policy, but that rationale cannot survive scrutiny. The company admits it does not consistently enforce the Bluetooth ban. Employees frequently used earbuds and phones while operating forklifts. Faulk presented video evidence, coworker declarations, and deposition testimony establishing that.  Moreover, Faulk showed that:

- Brown posted a Confederate flag on Facebook;

- HR failed to investigate Faulk's complaint about overtime deactivation;

- Brown solicited Holden to fabricate complaints about Faulk, and then Brown falsely claimed that Faulk was trying to do *exactly* what he was doing –soliciting Black employees to support Brown;

- Sean, a white employee, warned Faulk that Brown was setting him up;

- Rebecca Pike secretly recorded Faulk but never did so with others;

- Faulk was terminated after he told the EEOC what was happening.

An employer's "false or unworthy" justification is evidence of pretext. *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003) (citing *Wallace v. Methodist Hospital System,* 271 F.3d 212, 220 (5th Cir. 2001). Faulk has produced ample circumstantial and direct evidence showing that the stated reason for his termination was a cover for discriminatory and retaliatory intent.

## VI.    THE DISTRICT COURT IMPROPERLY WEIGHED EVIDENCE AND CREDIBILITY

Credibility determinations are reserved for the jury. *Anderson*, 477 U.S. at 255. The court below disregarded this standard. It found the statements of Faulk's witnesses speculative, while treating the employer's blanket denials as fact. Owens Corning claims to uphold diversity and inclusion. But that's not a defense to discrimination. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 147 (2000) ("Proof that the defendant's explanation is unworthy of credence is one form of circumstantial evidence that is probative of intentional discrimination…").  The court ignored the culture of fear, intimidation, and disparate enforcement that Plaintiff, Holden and Williams described. Both Holden and Williams were terminated shortly after resisting Brown's coercion. Other Black employees were written up or fired after crossing him. White and Hispanic employees were not.  That kind of environment cannot be evaluated through summary judgment and instead demands a jury, as Plaintiff requested.

### VII. THE COURT ELEVATED THE EMPLOYER'S SELF-SERVING DENIALS ABOVE SWORN TESTIMONY AND OBJECTIVE EVIDENCE

The court repeatedly cited Defendant's corporate commitments to diversity, its stated "zero tolerance" policy, and HR's general claims that it does not tolerate discrimination—as though these ended the inquiry. The court even absolved Defendant of responsibility for its actions against Faulk by stating that Brown had "disavowed" racism, which is not a legal concept that Plaintiff has ever seen.[156]

These findings are contrary to the law, particularly to permit them to be used to dismiss Plaintiff's claims on summary judgment. In *Reeves*, 530 U.S. at 147, the Court held that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." The district court essentially created a doctrine of racial immunity: that an employer's assertion of fairness and rehabilitation precludes discrimination as a matter of law. This result should not stand, and reversal of summary judgment is appropriate.

### VIII. DEFENDANT'S OWN DOCUMENTS AND ACTIONS UNDERMINE ITS STATED REASONS

Plaintiff presented evidence that Brown targeted him after a complaint about discrimination. His overtime was revoked without explanation. White coworkers did not face write-up or discipline for the same conduct. The HR representative, Rebecca Pike, admitted she secretly recorded Plaintiff, but not others. Pike claimed she was told Plaintiff might record

---

[156] Such a finding is equivalent to stating that an individual was no longer a member of the Ku Klux Klan. While it is certainly possible for an individual to disavow past acts, it is up to a jury to decide if this actually happened.

conversations—a justification never raised contemporaneously and clearly disparate treatment. Brown further sent texts to another employee with emojis celebrating Faulk's termination. The Confederate flag image had been public. Faulk's email to HR went unaddressed. These facts, combined, are not speculative allegations. These are facts from the record that warrant a trial to determine whether illegal conduct occurred. The trial court erred in ignoring them to support dismissal of Plaintiff's claims.

## CONCLUSION

The judgment of the district court dismissing Plaintiff's case in its entirety should be reversed. Summary judgment was improperly granted based on credibility determinations, failure to consider material facts, and misapplication of controlling law. Plaintiff is entitled to have a jury weigh the strong evidence he provided of violation of his civil rights.

Respectfully Submitted,

Dated: May 27, 2025                              CARLA D. AIKENS, P.L.C.


/s/ Carla D. Aikens
Carla D. Aikens (P69530)
615 Griswold St., Ste. 709
Detroit, MI 48226
Tel:   (844) 835-2993
Fax:   (877) 454-1680
*Attorneys for Appellant*

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing instrument was served upon all parties to the above cause to each of the attorneys of record herein on May 27, 2025 by:

/s/ Carla D. Aikens